(June 12, 2003)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RONALD LAPORTE, Appellant. [762 NYS2d 55] —Judgment, Supreme Court, Bronx County (Alexander Hunter, J.), rendered November 8, 2000, convicting defendant, after a jury trial, of robbery in the first degree, and sentencing him to a term of 12 years, unanimously reversed, on the law, and the matter remanded for a new trial.

We reverse because the prosecutor's remarks during summa-

tion so exceeded the limits of permissible comment that defendant was denied a fair trial.

Willie Frison was robbed of $95 and a cell phone in the elevator of his apartment building at 11:55 A.M. on November 2, 1998. Upon returning home from shopping, he noticed that a man he had never seen in the building followed him inside. Frison was not paying particular attention, but he saw the man walk to the rear of the lobby, then return to where Frison was waiting and enter the elevator behind him. The man asked Frison what floor he wanted, Frison answered and the man pushed the appropriate button. In the elevator, Frison stood behind and to the side of the man. At the eighth, ninth or tenth floor, the elevator stopped and the man exited. But, as the doors were closing, he rushed back in and told Frison to "get back before I blow your so and so head off." He warned Frison several times not to look at him and Frison, thinking the man had a gun, obeyed, although he did manage to sneak a few peeks at the man. Frison, who was 84 years old and needed glasses for reading and for driving, was not wearing his glasses at the time. The man knocked the groceries out of Frison's hands, took Frison's cash and cell phone, and exited the elevator. Frison never actually saw a gun.

Frison called 911 from his apartment and reported that he had been robbed by a black man between 6 feet, 5 inches and 6 feet, 6 inches tall, wearing a brown hat. Frison himself is 5 feet, 11½ inches tall. When the police arrived, Frison told them what happened and further described his assailant. Based on his description, an officer recorded that the perpetrator was a black man anywhere from 19 to 25 years of age, 6 feet, 4 inches tall and approximately 170 pounds, and that he was wearing crepe-soled shoes. The officers canvassed the neighborhood with Frison to no avail and then took him to the police station where he was interviewed again.

An investigation subsequent to that interview led the police to an address in Co-op City. In May 1999, defendant was arrested at the U.S. Tennis Center in Queens, where he was working as a uniformed guard. At the time of his arrest, defendant, a black man, was 37 years old, 6 feet tall and 205 pounds, with a scar on his forehead and a mustache. He told the detective who arrested him that he was homeless but still received mail at his last residence, the aforementioned address in Co-op City.

At a lineup conducted on May 24, 1999, Frison told the detective that "it looks like number four but it's definitely number three." Defendant was in position number three. At trial, when

he was asked on the witness stand if he saw his assailant in the courtroom, Frison pointed to an individual who was not thereafter identified on the record. Frison subsequently left the stand, walked to where defendant was sitting and pointed at him. When asked if he was 100% positive that defendant was the man who robbed him, Frison answered, "Yes, sir. I believe he is the—just like the person that robbed me."

In his summation, the prosecutor exceeded the well-defined limits of proper rhetorical comment (*People v Ashwal*, 39 NY2d 105, 109 [1976]). Although it is improper for a prosecutor to impugn defense counsel's integrity (*see e.g. People v McReynolds*, 175 AD2d 31 [1991]) or denigrate the defense theory (*see e.g. People v World*, 157 AD2d 567, 568 [1990]), the prosecutor began with an ad hominem attack on defense counsel and ridicule of the defense theory. He said, after hearing defense counsel's summation, "I don't know if it's up or down now, left means right, day means night, and I'm pretty certain that the moon is made of green cheese." He persisted with this theme throughout, repeatedly characterizing the defense theory as "mumbo jumbo" and describing defense counsel's remarks as "double talk." He also warned the jurors several times in so many words that defense counsel was manipulating them and trying to prevent them from using their common sense.

Another persistent theme of the prosecutor's summation was the proper respect owed Frison by the jury due to his status as a veteran of the Second World War, about which Frison testified extensively on direct examination. The prosecutor told the jury:

"He is a war hero. He fought in combat. He has experiences the rest of you can't imagine. You can watch the Discovery Channel. You can watch the History Channel, but you can't imagine what he's been through. And you're supposed to believe that his experiences don't count anymore?

"Now that he came before you, everything he's been through, he forgot? He doesn't know how to use those talents? He didn't go through combat for nothing. He certainly didn't go through combat to be called a doddering fool who can't make an I.D.

"The difference perhaps between you and me and him, the combat hero came out. He's seen guns. He's been shot. He sees a gun. He knows to make decisions. The difference is he decided, he told you, I had to defend myself. I had to protect myself. I don't know if this guy is a nut or not, a nut with a gun.

"What do you think he thought was going to happen? He didn't know if the guy was going to shoot him. He made a

decision. He didn't panic. He's been under fire, and in that decision he said, I'm going to remember this guy. That's the difference. That's the difference. You realize that people are different. That's why his background is important. You're judging Mr. Willie Frison. Remember that at all times when you get back there. You're not judging some abstraction, Mr. Willie Frison.

"It is a tragedy if someone is wrongfully identified. It's also a tragedy when someone plays by the rules their whole life, and they do have the capability to make an identification and they make that identification and they come into court and they get told by twelve people of their own county, you can't do it."

The prosecutor also admonished the jury not to judge Frison on the basis of his advanced age. Thus, although it is improper for a prosecutor to vouch for the credibility of witnesses (*see People v Bailey*, 58 NY2d 272, 277 [1983]) or to appeal to the sympathies and fears of the jury (*see e.g. People v Ortiz*, 116 AD2d 531, 532 [1986]), the prosecutor used Frison's status as a veteran and his advanced age to try to make the jury feel guilty if it doubted Frison's identification of his assailant.

In addition to "lead[ing] the jury away from the issues by drawing irrelevant and inflammatory conclusions which have a decided tendency to prejudice the jury against the defendant" (*People v Ashwal*, 39 NY2d at 110), the prosecutor impermissibly shifted the burden of proof from the People to the defendant by posing certain rhetorical questions to the jury. Although it is improper for a prosecutor to refer to the defendant's failure to call witnesses on his own behalf or to suggest that he failed to call certain witnesses because their testimony would have been unfavorable (*People v Grice*, 100 AD2d 419, 422 [1984]), the prosecutor asked, "You didn't hear anything from them that that's not how the crime happened, did you? No." He also asked, "If there were lineup experts to give you, why didn't they give you one? They put on a case. You want lineup experts, call one. Two sets of lawyers in this case. No lineup experts called. They don't exist" (numerous sustained objections omitted). We note parenthetically that defense counsel at no time suggested that a lineup expert was needed.

Moreover, despite the "elementary rule" that a criminal defendant's general character may not be made an issue unless he chooses to make it so by putting in affirmative proof of good character (*People v Richardson*, 222 NY 103, 107 [1917]) and although defendant neither testified at trial nor otherwise placed his character in issue, the prosecutor urged the jury to infer from his homelessness that defendant chose to live on the

streets so that he could fulfill his propensity to commit crime. After reminding the jurors that at the time of his arrest defendant said he was homeless but received mail at a particular address, the prosecutor commented, "Someone knows he's out on the street and won't let him live there. Why? What does that tell you about his character? You're not supposed to listen to anything that proves he's guilty. Remember that. It's either that someone won't let him live there or he's choosing not to. He would rather [live on] the street than follow rules. You know that because Mr. Frison [*sic*] told you he doesn't follow the rules, and that's corroboration from his own mouth. He doesn't like the rules" (repeated overruled objections omitted). The prosecutor also more than once referred to defendant, inappropriately, as a predator (*see People v Chapin*, 265 AD2d 738, 739 [1999], *lv denied* 94 NY2d 917 [2000]).

These comments cannot be considered fair response to defense counsel's summation (*see People v Galloway*, 54 NY2d 396 [1981]), which simply detailed the evidence adduced at trial and pointed out the weaknesses in the People's case. Moreover, the evidence of defendant's guilt is hardly overwhelming. The "pivotal issue of identification, although sufficient for presentation to the jury, was not free from doubt" (*see People v Perez*, 102 AD2d 797, 797-798 [1984]). Frison, who had only a limited opportunity to view his assailant and was not wearing his glasses at the time, initially described the perpetrator as a man five or six inches taller than himself, while defendant is approximately the same height as Frison. Like his suggestion to the jurors that a failure to convict would be tantamount to a denial of justice to this elderly war veteran who served his country under General Patton, all the prosecutor's various improper remarks were aimed at "sidetracking the jury from its ultimate responsibility—determining facts relevant to guilt or innocence" and their cumulative effect substantially prejudiced defendant's rights (*People v Calabria*, 94 NY2d 519, 523 [2000]).

We have considered and rejected defendant's remaining arguments. Concur—Buckley, P.J., Rosenberger, Ellerin, Wallach* and Lerner, JJ.